**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Lori BLITZ, aka Jackie Cross,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jerry Pierre SAINTE MARIE,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kristen Leon HALL, aka Leon Hall,**
**Defendant–Appellant.**

---

* Argument was not held on *United States v. Hall*, 151 F.3d 1002 (9th Cir.1998). The panel unanimously found it suitable for submission without

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jacob GIFFIN, Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Norman HEFFERAN, aka Bill Edwards;**
**aka Norm Craig, Defendant–**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Harold LARSEN, Defendant–Appellant.**

Nos. 97–50326, 97–50327, 97–50406, 97–50410, 97–50432 and 97–50559.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 8, 1998.*

Decided Aug. 6, 1998.

oral argument pursuant to Fed. R.App. P. 34(a) and Ninth Cir. R. 34–4.

Michael S. Meza, Santa Ana, California, for defendant-appellant Blitz.

John W. Barton, Newport Beach, California, for defendant-appellant Hefferan.

Dwight B. Moore, Santa Ana, California, for defendant-appellant Ste. Marie.

James L. Waltz, Laguna Hills, California, for defendant-appellant Hall.

Emily S. Uhrig, Deputy Federal Public Defender, Los Angeles, California, for defendant-appellant Giffin.

Jerome Goldfein, Westminster, California, for defendant-appellant Larsen.

Ellyn Marcus Lindsay, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: FLETCHER, FERNANDEZ, and RYMER, Circuit Judges.

FERNANDEZ, Circuit Judge:

Lori Blitz, Norman Hefferan, Jerry Pierre Ste. Marie, Kristen Leon Hall, Jacob Giffin, and Harold Larsen [1] appeal their convictions and sentences for mail and wire fraud arising from a telemarketing scheme (Nortay Consultants) which defrauded victims into paying retainer fees in exchange for false promises of recovery of the money they had previously lost to other telemarketers. Hall challenges the sufficiency of the evidence to support his jury convictions. Hall and Larsen challenge the admission of two pieces of evidence introduced at trial. Further, all of the Telemarketers challenge their sentences, in particular the district court's calculation of the loss intended to be inflicted upon the victims. Finally, Hefferan challenges his restitution order. We dismiss Hefferan's appeal, and affirm the Telemarketers' convictions and sentences.

## BACKGROUND

Nortay Consultants (Nortay) was formed by Blitz, Hefferan and Larsen in February of 1993 as a business that purported to recover money that individuals, mostly elderly, had lost to fraudulent telemarketing companies. Nortay telemarketers utilized lead lists that identified as prospective customers the victims of other fraudulent telemarketing companies. Those included companies for which most of Nortay's telemarketers had previous-

---

1. We will refer to all of them, other than Hefferan, with the collective phrase "the Telemarketers."

ly worked. Nortay telemarketers would call the victims, falsely tell them that Nortay had performed research on their cases, and represent that Nortay could help them recover the lost funds. The Nortay telemarketers made misrepresentations that Nortay was a public advocacy company, or that it had a "fraud division." They falsely told the victims that in order for Nortay to represent them legally in retrieving the lost funds, the victims would have to send retainer fees, and that those fees would be applied to Nortay's charge of 25% of all recovered funds. They also falsely promised the victims a refund of their retainer fees if Nortay was unable to recover the lost funds. The customers were sent "guaranteed" service contracts, which also falsely promised a full refund if Nortay did not succeed in making a recovery.

In general, the victims who sent Nortay retainer fees received no money back in the form of a recovery of money lost to other telemarketers; nor did they obtain refunds of their retainer fees. Nortay's bank records showed that Nortay obtained approximately $481,868 from the victims, and paid a small portion back to the victims. Many of the victims who received money back had sent Nortay more money than they received back. Nortay defrauded approximately 1,100 victims.

Blitz, Hefferan and Larsen were co-owners of Nortay. Larsen eventually left Nortay because of his disagreement with Blitz and Hefferan over ownership responsibilities. Blitz was the only person at Nortay who purportedly handled the recovery of the lost funds, and she was the sole signatory on Nortay's bank account. Hefferan was the sales manager and a closer—a high-pressure salesman who completed the sales. Larsen and Ste. Marie were also closers. Hall worked as a "qualifier," also known as a "dialer." He would identify victims on the lead lists who had lost substantial amounts of money. He would give those names to the closers who would complete the deal. Giffin worked first as a qualifier, and then as a closer. Prior to their employment with Nor-

tay, all of the Telemarketers had a lengthy record of involvement in fraudulent telemarketing schemes. Hefferan, Ste. Marie and Blitz had been arrested for engaging in fraudulent telemarketing, and Hefferan and Ste. Marie had sustained convictions.

On January 7, 1997, the Telemarketers and Hefferan were indicted on ten counts of mail fraud, nine counts of wire fraud, and eight counts of money laundering. Blitz, Hefferan and Ste. Marie pled guilty to one count of mail fraud and one count of wire fraud. Larsen, Giffin and Hall proceeded to trial. The jury convicted Larsen of one count of mail fraud, and one count of wire fraud, but was unable to reach a verdict as to the remaining two counts. It convicted Giffin of three counts of mail fraud, and six counts of wire fraud, but was unable to reach a verdict as to the remaining two counts. Hall was convicted of two counts of wire fraud, as charged. The Telemarketers and Hefferan were each sentenced to a term of imprisonment and were ordered to pay restitution. This appeal ensued.

## JURISDICTION

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.[2]

## DISCUSSION

### A. HEFFERAN'S WAIVER OF HIS RIGHT TO APPEAL

■ The government argues that we should dismiss Hefferan's appeal because he waived the right to appeal his sentence in the plea agreement. We agree. We review *de novo* whether the defendant has waived his statutory right to appeal. *See United States v. Schuman,* 127 F.3d 815, 817 (9th Cir.1997).

■ By signing his plea agreement, Hefferan waived the right to appeal his sentence unless it exceeded the maximum provided by law, or unless the sentencing court departed

---

2. We lack jurisdiction to consider Ste. Marie's appeal from the district court's selection of his sentence within the properly calculated guideline range of 37 to 46 months. *See United States v.*

*Young,* 988 F.2d 1002, 1004 (9th Cir.1993); *United States v. Dixon,* 952 F.2d 260, 262 (9th Cir.1991).

upward from his sentencing guideline range. He also waived the right to appeal any restitution order not exceeding $481,000. An express waiver of the right to appeal is valid as long as it is knowingly and voluntarily made. *See United States v. DeSantiago–Martinez*, 38 F.3d 394, 395 (9th Cir.1992). Hefferan makes no argument that his waiver of appeal was invalid; nor is there any indication that his waiver was not knowing and voluntary. Hefferan's sentence does not exceed the maximum provided by law and does not involve a departure. His restitution order does not exceed $481,000. Accordingly, we dismiss Hefferan's appeal. *See United States v. Michlin*, 34 F.3d 896, 901 (9th Cir.1994).

### B. *SUFFICIENCY OF THE EVIDENCE TO SUPPORT HALL'S CONVICTIONS*

■ Hall claims that there was insufficient evidence to support his wire fraud convictions. Because he made a motion for a judgment of acquittal at the close of the government's case and again at the close of all evidence, he preserved this issue for appeal. *See United States v. Carpenter*, 95 F.3d 773, 775 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1094, 137 L.Ed.2d 227 (1997). We review the sufficiency of the evidence by viewing it in the light most favorable to the prosecution and asking whether *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also Carpenter*, 95 F.3d at 775.

■ The record of this case contains ample evidence from which a rational jury could find Hall guilty of wire fraud, which is established through the existence of a scheme to defraud and the use of interstate wires in furtherance of that scheme. *See United States v. Hubbard*, 96 F.3d 1223, 1227–28 (9th Cir.1996); *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir.1992). The government presented overwhelming evidence that the Nortay telemarketers engaged in a scheme to defraud victims of other fraudulent telemarketing schemes, in many of which Nortay telemarketers had themselves been involved. In fact, Hall does not dispute that Nortay was a fraudulent telemarketing company. Rather, he argues that there is no evidence that he either participated in the wire fraud charged in the indictment, or aided others in perpetrating a fraud. We disagree.

The victim named in one of the counts of conviction told the jury that Hall called her and falsely promised to recover the money she had lost to other telemarketers if she sent Nortay a retainer fee. She sent in $500, but never got any money back from Nortay. She told the jury that the fact that Nortay promised a one hundred percent money-back guarantee was important in her decision to send the money, and that had she known that Nortay employees were all former telemarketers, she would have never sent them the money.

Hall did not personally call the victim named in the other count of conviction; she was contacted by another Nortay telemarketer. However, as a knowing participant in a scheme to defraud Nortay customers, Hall is liable for his "co-schemers' use of the mails or wires." *Lothian*, 976 F.2d at 1263. And the evidence at trial clearly established that Hall knowingly participated in Nortay's fraudulent activity with intent to defraud Nortay's customers. His own lies were legion.

The jury heard the tape recordings of Hall's three telephone calls to Nortay's prospective victims in which he made numerous misrepresentations with the intent to gain the person's trust and to induce that person into retaining Nortay's services. In fact, Hall admitted to the FBI case agent that he had told various lies to Nortay's customers. He also admitted to the FBI that he laughed at Nortay's victims, and called them naive and stupid for not even checking up on Nortay before sending the money. That evidence was sufficient to support the jury's finding that Hall knowingly participated in Nortay's fraudulent scheme and should, therefore, be held responsible for fraud perpetrated by his co-schemers. *See Lothian*, 976 F.2d at 1263, 1267–68 (evidence that the telemarketer made "extensive misrepre-

sentations to customers" concerning the company's operations was sufficient to support his conviction of wire fraud based on his own conduct and that of other telemarketers); *see also United States v. Gray*, 105 F.3d 956, 966–67 (5th Cir.1997) (evidence that the telemarketer engaged in "active deception" and was aware that the customers were not receiving the promised refunds was sufficient to support a fraud conviction), *cert. denied*, — U.S. —, 117 S.Ct. 1856, 137 L.Ed.2d 1057 (1997); *United States v. Leonard*, 61 F.3d 1181, 1187–88 (5th Cir.1995) (evidence supported the jury's finding that the defendants knowingly participated in the telemarketing scam based on various misrepresentations they made to the customers).

## C. *ADMISSION OF EVIDENCE AT TRIAL*

■ Larsen and Hall challenge the admission of two pieces of evidence at trial: (1) Nortay bank records, and (2) evidence of their prior employment at another fraudulent telemarketing company. We review the district court's admission of evidence for abuse of discretion. *See United States v. Nguyen*, 88 F.3d 812, 818 (9th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996).

### (1) *Nortay bank records*

■ The claim that Nortay bank records should have been excluded because they had "minimal relevance" and were unfairly prejudicial has no merit. Under Rule 401 of the Federal Rules of Evidence, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401; *Nguyen*, 88 F.3d at 819. Nortay bank records went to one of the central issues in this prosecution for mail and wire fraud—the existence of a scheme to defraud Nortay customers. *See Hubbard*, 96 F.3d at 1227–28. The records revealed that while a great deal of money flowed into Nortay's account from the customers, very little was paid out of the

account to them. The records, therefore, had some tendency to show the fraudulent nature of Nortay's telemarketing scheme. *See United States v. Brutzman*, 731 F.2d 1449, 1452 (9th Cir.1984) (the government could establish the fraudulent nature of the scheme by showing that the defendant used his consulting fees, which he promised to safeguard and refund in full if his investment program failed, to pay for equipment, employee compensation, and his own personal expenses).

It would be an unusual case indeed where the financial records of a fraudulent enterprise like Nortay would be considered irrelevant in a prosecution for fraud. This is not that case. Furthermore, it is difficult to imagine how the probative value of the records could have been "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. While we hear the general ululation about unfairness, we have not heard any specific explanation of how this evidence caused "unfair prejudice." Admission of Nortay bank records was well within the district court's discretion.

### (2) *Prior employment at a fraudulent telemarketing company*

Larsen argues that the evidence of his prior employment at another telemarketing company, National Promotional Clearing Center (NPCC), was improperly admitted at trial because it did not meet the four part test under Rule 404(b) of the Federal Rules of Evidence, and because it was unfairly prejudicial. We disagree.[3]

■ Evidence of a defendant's "other acts" may be admitted to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). So long as the evidence is offered for a proper purpose, "the district court is accorded wide discretion in deciding whether to admit the evidence." *United States v. Johnson*, 132 F.3d 1279, 1282 (9th Cir.1997). We have interpreted Rule 404(b) "as one of inclusion." *United States v. DeSalvo*, 41 F.3d 505, 509 (9th

---

**3.** Hall merely joins Larsen's argument without applying Rule 404(b) analysis to his individual facts. Because we reject Larsen's argument, Hall's claim must necessarily fail.

Cir.1994). Other acts evidence is admissible if: (1) it is "introduced to prove a material issue in the case," (2) in some instances, the acts are "similar to the offense charged," (3)"sufficient evidence [exists] for the jury to find that the defendant committed the other act(s)," and (4) the other act(s) are "not ... too remote in time." *United States v. Nelson*, 137 F.3d 1094, 1107 (9th Cir.1998); *see also Johnson*, 132 F.3d at 1282; *DeSalvo*, 41 F.3d at 509. Of course, the probative value of the evidence must not be "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403.

The evidence of Larsen's prior employment at NPCC satisfies the four-part test. First, it was introduced to disprove Larsen's claim that he did not know Nortay was a fraud. As the district court put it: "He was engaged in fraud then, he would know fraud when he sees it now." *See United States v. McDonald*, 576 F.2d 1350, 1356 (9th Cir. 1978) (evidence concerning defendant's participation in other land fraud schemes was admissible to rebut his claim that he had no knowledge of fraud in the land fraud scheme with which he was charged); *see also United States v. Otis*, 127 F.3d 829, 834 (9th Cir. 1997) (prior drug convictions were admissible to show that defendants were familiar with the cocaine business and therefore had knowledge that the money was derived from cocaine sales), *cert. denied*, —— U.S. ——, 118 S.Ct. 1400, 140 L.Ed.2d 657 (1998); *DeSalvo*, 41 F.3d at 509 (prior false statements were admissible to establish the defendant's knowledge in the fraud prosecution); *United States v. Corona*, 34 F.3d 876, 881–82 (9th Cir.1994) (drug customer lists were admissible to rebut the defendant's claimed ignorance about the charged drug transaction); *United States v. Jackson*, 845 F.2d 880, 884 (9th Cir.1988) (prior false claims were admissible to show intent, knowledge, and absence of mistake in making false claims with which he was charged).

Second, when the evidence of other acts is offered to prove knowledge, the other acts need not be similar to the charged acts as long as they " 'tend to make the existence of the defendant's knowledge more probable than it would be without the evidence.' " *Co-rona*, 34 F.3d at 882 (citation omitted). Larsen's prior involvement in fraudulent telemarketing actually was similar and also makes it more probable that he knew that Nortay was a fraud.

Third, there was sufficient evidence from which the jury could conclude that Larsen was involved in fraudulent telemarketing at NPCC. He does not dispute that he worked at NPCC as a salesman. However, he claims that the government did not show that NPCC ever defrauded its customers. As we noted in *United States v. Melvin*, 91 F.3d 1218, 1222 (9th Cir.1996), "if this scheme was indeed legitimate, [the defendant] cannot assert that it prejudiced the jury, or that it was inadmissible evidence of other bad acts." Moreover, the government presented substantial evidence to establish that the NPCC was engaged in fraudulent telemarketing. It was a typical scam where victims were told that they were "guaranteed winners" of a big prize, but also were told that in order to quality for it, they had to buy a product, such as cosmetics, perfumes, pens or pencils. Those products were sold at grossly inflated prices ranging from $250 to a couple of thousand dollars. Of course, the victims did not then receive the big prize. Larsen conceded that he sold pen sets, vitamins, and makeup for $299 to $999. He also conceded that he never heard of a customer who got one of the promised large prizes. Moreover, he testified that at Nortay he was trying to get money back for people who *felt* that they had been defrauded by NPCC.

Finally, Larsen's employment at NPCC occurred within a year of his involvement with Nortay, which is clearly not too remote in time. *See Johnson*, 132 F.3d at 1283 (the acts that occurred thirteen years prior to the charged offense were not too remote).

Where, as here, the evidence satisfies the four-part test, "the district court should admit the evidence unless its prejudicial impact substantially outweighs its probative value." *Id.* at 1282. The decision with regard to prejudice is "committed to the sound discretion of the trial court." *McDonald*, 576 F.2d at 1356. If Larsen's insistence that the evidence at trial did not establish that NPCC's customers were defrauded is right, he has

not shown that the introduction of evidence of his employment at NPCC caused him prejudice at all. *See Melvin,* 91 F.3d at 1222. And even if that evidence resulted in some prejudice (as all unfavorable evidence about a defendant does), it was not "unfair prejudice" and did not "substantially outweigh" the high probative value of the evidence. *See United States v. Simas,* 937 F.2d 459, 464 (9th Cir. 1991) (although the evidence of "other acts" was "damaging," the defendant has not shown that it resulted in "*unfair* prejudice"); *United States v. Parker,* 549 F.2d 1217, 1222 (9th Cir.1977) (stating that the evidence of other bad acts " 'is not rendered inadmissible because it is of a highly prejudicial nature[,][t]he best evidence often is;' " "the district judge's determination in this area is to be reversed only if he has abused his wide discretion") (citation omitted). The district court did not abuse its discretion.

## D. *SENTENCING ISSUES*

The Telemarketers challenge the sentences that the district court imposed upon them. In particular, they raise several objections to the court's calculation of loss inflicted on Nortay's victims.

 "We review the district court's interpretation and application of the Sentencing Guidelines de novo." *United States v. Newland,* 116 F.3d 400, 402 (9th Cir.1997). We review the district court's factual findings used in sentencing, including the calculation of loss to the victims, for clear error. *See United States v. Clayton,* 108 F.3d 1114, 1118 (9th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 233, 139 L.Ed.2d 165 (1997). However, we review the district court's determination that a particular item of evidence is sufficiently reliable to be considered at sentencing for abuse of discretion. *See United States v. Pinto,* 48 F.3d 384, 389 (9th Cir. 1995).

### (1) *Intended loss calculation*

 A number of the Telemarketers argue that the district court erred when it calculated their guideline scores based upon

intended loss, a calculation that was, in turn, based upon Nortay's sales log. Under the guideline which applies to fraud, the offense level is calculated by adding points (based upon the amount of the loss) to the base offense level of six. *See* USSG § 2F1.1.[4] As the loss increases, so do the points. Moreover, when "an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." *Id.* at comment. (n.7).

The first attack of the Telemarketers is on the sales log itself, or, rather, on its significance. They suggest that the log did not really record the amount of loss that they meant to inflict upon the victims. Witnesses at the trial testified that the amounts entered into the sales log ($1,015,703 in all) reflected those amounts promised or pledged by the victims of the Telemarketers. While the Telemarketers insist that the amounts were merely a "wish list" or that the amounts reflected figures that merely had been quoted to the victims, the witnesses' testimony provided ample evidence from which the district court could conclude that the amounts did constitute pledges, and that in any event, the amounts reflected what the Telemarketers intended to extract from their victims. The district court did not clearly err in concluding that the sales log was an accurate reflection of the Telemarketers' intended losses.

Because the sales log did reflect the intent to make a dent in each victims' cash cache, it was proper to consider the log in determining the amount of the intended loss. As we have often said, intended loss is a proper measure to use in fraud cases. *See United States v. Gallagher,* 99 F.3d 329, 334 (9th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1274, 137 L.Ed.2d 351 (1997); *United States v. Robinson,* 94 F.3d 1325, 1327–29 (9th Cir.1996). Not surprisingly, telemarketing schemes are treated no differently in that respect. *See United States v. Amlani,* 111 F.3d 705, 719 (9th Cir.1997). We reject the

4. All references are to the November 1, 1996, version of the Sentencing Guidelines, together with the May 1, 1997, supplement.

attack on the use of the log.[5]

But, argue the Telemarketers, it was not realistic to believe that their plan would fully succeed, and they did not think it would. Some fish would get away despite the Telemarketers best efforts to reel them in. That, say they, shows that using the log could not be the "realistic, economic approach" to determining the offense level, which we have uniformly required.

The cases upon which the Telemarketers rely for that proposition do not support their thesis. They cite *United States v. Allison*, 86 F.3d 940, 943 (9th Cir.1996), and *United States v. Harper*, 32 F.3d 1387, 1392 (9th Cir.1994). However, in *Allison* the issue was whether the full amount charged on fraudulently obtained credit cards should be used when the cardholder had paid back a substantial amount before he was caught. *See id.* at 941–42. We held that it was not realistic to refuse to deduct the amounts paid on the debt. *See id.* at 943–44. It could not be said that the defendant intended to defraud the credit card company of the payments actually made to it. *Harper* is even further afield. It involved an equity skimming scheme, which is a form of fraud where real property is purchased from debtors in distress who are subject to foreclosure proceedings. The skimmer keeps the rents that accrue between the date of purchase and the date of the inevitable foreclosure. *See id.* at 1388–89. We held that it was unrealistic to say that the skimmer had either intended to take or had actually taken the full fair market value of the real property involved. To do so would not properly "examine the wrongdoing, both intended and actual," and would "assume[ ] a loss to the victim that is not realistic." *Id.* at 1392. It could not realistically be said that the skimmer had intended to inflict a greater loss than he actually did. In the case at hand, the telemarketers may not have inflicted all of the loss they really wanted to inflict, but that was not from any lack of intent.

In other words, when we have required a realistic economic approach we have indicated that we should not ascribe a larger loss to the defendants than they intended to or actually did inflict. We have not, however, hesitated to hold defendants responsible for the full reach of their intent, even when that intent was thwarted. The fact that, due to conditions beyond their control, the seed that defendants had so hopefully sowed could never grow into a harvest crop has not affected our determination of the intended loss itself. *See Robinson*, 94 F.3d at 1327–28 (false credit cards could not actually inflict loss because they were sold to government agents, but that did not affect the loss calculation); *United States v. Salemo*, 81 F.3d 1453, 1463 (9th Cir.1996) (where numerous fraudulent loan applications were submitted and the defendant *knew* that some would be rejected, the intended loss was not affected), *cert. denied*, —— U.S. ——, 117 S.Ct. 436, 136 L.Ed. 333 (1996); *United States v. Lorenzo*, 995 F.2d 1448, 1460 (9th Cir.1993) (the fact that the false tax refunds claimed could not realistically be obtained did not affect the loss calculation); *United States v. Koenig*, 952 F.2d 267, 271–72 (9th Cir.1991) (the fact that defendants may not have been able to use all of the false ATM cards they had did not change their intent). The Telemarketers seek to rely upon the Sixth Circuit's statement that the loss must not only be intended, but also possible of infliction. *See United States v. Watkins*, 994 F.2d 1192, 1196 (6th Cir.1993). They seek in vain because, as the authorities we have just cited demonstrate, that theory has been roundly rejected in this circuit. It has also been rejected in the Seventh Circuit. *See United States v. Yusufu*, 63 F.3d 505, 513–14 (7th Cir.1995).

In sum, the district court did not err when it used the amounts shown on the sales log to arrive at the amount of loss to be charged to

---

**5.** We also reject the Telemarketers' contention that the log was not a sufficiently reliable source of information to be used for calculation of loss. Under the Guidelines, the district court is only required to make a reasonable estimate of the loss, given the available information. *See* USSG § 2F1.1, comment. (n.8). In doing so, the district court may consider any evidence "so long as it has sufficient indicia of reliability to support its probable accuracy." *Pinto*, 48 F.3d at 389 (internal quotations omitted). The sales log had sufficient indicia of reliability. It was admitted at trial as a business record, and several witnesses testified about the source of the information in the log and what the amounts recorded represented.

the Telemarketers in calculating their guideline scores.

### (2) *Attempt reduction*

The Telemarketers attempt to have their offense levels reduced on the theory that at least some of their intended frauds were only attempts because they did not actually succeed in euchring all of their victims out of all of their funds. *See* USSG § 2X1.1(b)(1). They rely on a provision which reads:

> If an attempt, decrease by 3 levels, unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control.

*Id.* Moreover, an application note for the fraud guideline does state that "[i]n the case of a partially completed offense ... the offense level is to be determined in accordance with the provisions of § 2X1.1...." USSG § 2F1.1, comment. (n.9). All of that is of little help to the Telemarketers, however.

It is important to consider the nature of the frauds at hand. They were not simply of a general type. They were mail and wire frauds. Those crimes have a unique characteristic. Each one is complete when the mail or wire has been used. For each, the mere existence of the scheme plus the use of the mail, or an interstate wire, to further the scheme will suffice. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 559, 139 L.Ed.2d 401 (1997); *Hubbard,* 96 F.3d at 1227–28; *Lothian,* 976 F.2d at 1262.

Therefore, each completed call was a separate, completed fraud offense. *See United States v. Nash,* 115 F.3d 1431, 1441 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1054, 140 L.Ed. 117 (1998); *United States v. Niven,* 952 F.2d 289, 293 (9th Cir. 1991); *Nelson v. United States,* 178 F.2d 458, 458–59 (9th Cir.1949); *see also United States v. St. Gelais,* 952 F.2d 90, 96–97 (5th Cir. 1992); *United States v. Fermin Castillo,* 829 F.2d 1194, 1199–1200 (1st Cir.1987). Of course, that was true even if the object of the

fraud was not ultimately attained because the funds were not sent in. *See United States v. Carrington,* 96 F.3d 1, 7–8 (1st Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1328, 137 L.Ed.2d 489 (1997). The crimes were no mere attempts; each was complete when the call was made or the letter was sent. *See id.* Certainly if the money came in, it would be fraud proceeds. *See United States v. Savage,* 67 F.3d 1435, 1442–43 (9th Cir.1995), *cert. denied,* 516 U.S. 1136, 116 S.Ct. 964, 133 L.Ed.2d 885 (1996). But with or without the money, the offense was complete. So, too, was the intended loss complete at that point. *See Yusufu,* 63 F.3d at 514 (stating that the attempt guideline "has nothing to do with the amount of loss for a completed crime").

Along those same lines, the district court found that the evidence showed that for all practical purposes by the time a sale was entered into the log, the fraud was completed. In general, nothing more had to be done, although more would be done if necessary. The act of fraud, the court decided, was substantially complete and the only question was whether the money would flow in. Often it did. When it did not, it was only something beyond the Telemarketers control that prevented it from doing so. Perhaps, for example, the victim came to a late infusion of wisdom and, thus, gave the lie to the Telemarketers' jests that their victims were fatuous for not checking them out before sending more money off into oblivion. At any rate, the louche deeds were completed, so, as the district court found, the reduction did not apply at all.

In fine, not only were the substantive mail and wire fraud offenses actually completed crimes rather than mere attempts, but also the district court found that, from their perspective, the Telemarketers had done all of the acts that they believed were necessary to successfully complete their frauds on their victims. The three point attempt reduction was not available.

### (3) *Reduction for cancellations, refunds and recoveries*

 Several of the Telemarketers argue that the district court erred when it declined

to offset the amount of intended loss by the amount of the recoveries they obtained for their customers, the refunds of the retainer fees allegedly made on rare occasions, and the canceled sales. We find no error.

The Telemarketers were not entitled to a credit for the canceled sales. They clearly intended to defraud every victim whose name showed up on the sales log. The fact that some victims canceled the deal at a later date did not affect the Telemarketers' intent. Thus, it does not affect the intended loss.

They also were not entitled to a credit for the refunds they purportedly gave to some of Nortay's victims. We have recognized that "value may be rendered even amid fraudulent conduct," and that in calculating intended loss, the district court should give credit for any legitimate services rendered to the victims. *United States v. Barnes,* 125 F.3d 1287, 1291 & n. 1 (9th Cir.1997); *see also United States v. Rutgard,* 116 F.3d 1270, 1294 (9th Cir.1997). The refunds, however, did not constitute legitimate services rendered to Nortay customers. Instead, they were a part of Nortay's fraudulent scheme. The district court found that if Nortay did return some money to its victims, it was done for the sole purposes of deflecting serious disruption of their schemes and making the operation look legitimate, which in turn enabled Nortay to defraud a greater number of victims.[6]

The Eighth Circuit has recently declined to reduce the amount of loss by the amount of the overhead expended in running a fraudulent telemarketing scheme, which included among other things the cost of handling and shipping "prizes" to the customers. *See United States v. Whatley,* 133 F.3d 601, 606 (8th Cir.1998), *cert. denied,* —— U.S. ——, 118 S.Ct. 2347, 141 L.Ed.2d 717 (1998). The court stated that it was not inclined to allow the telemarketers "a credit for money spent perpetuating a fraud." *Id.* Similarly, we decline to give Nortay telemarketers any credit for the money they spent in perpetuating the fraud against their victims. The occasional refund to customers was merely a cost of

doing business. Indeed, giving the Telemarketers a credit for refunds would be similar to allowing them a deduction for their phone bills.

Moreover, the district court did not err when it failed to give the Telemarketers a credit for the small amount of recoveries that Nortay allegedly obtained for its customers. The district court found that the whole scheme was a fraud from start to finish, and that finding was not clearly erroneous. The recoveries, like the refunds, enabled the Telemarketers to continue their scheme for a longer period by staving off detection.

### (4) *Relevant conduct*

██ Several of the Telemarketers argue that the district court erred when it held them responsible for the entire loss caused by Nortay during the term of their employment at the company. They contend that the sales by other Nortay telemarketers were not within the scope of the criminal activity they had agreed to undertake, and that they should have been held accountable only for their own sales. The district court did not err.

Section 1B1.3(a)(1)(B) of the Sentencing Guidelines, which governs relevant conduct, provides that in the case of "a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," the defendant's sentence shall be determined on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." The Application Notes further indicate that in the case of "jointly undertaken criminal activity," the defendant should be held accountable for the conduct of others that was both: "(i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity." USSG § 1B1.3, comment. (n.2). In determining a defendant's liability under this section, a court must determine "the scope of

---

**6.** Indeed, on appeal Giffin, for example, concedes that Nortay had "fraudulent motives in

returning moneys to its customers."

the criminal activity the particular defendant agreed to jointly undertake." *Id.*

The Telemarketers strongly rely on the Second Circuit's decision in *United States v. Studley*, 47 F.3d 569, 576 (2d Cir.1995), which held that the facts of that case could not support a finding that the defendant was responsible for the activities of other telemarketers. Their reliance on *Studley* is misplaced. In *Studley*, the defendant was not responsible for the activities of other telemarketers because he did not design or develop the fraudulent scheme; did not work in any way to further the scheme outside of his own sales efforts; was paid on a pure commission basis, and received no profits from the overall operation; did not assist other representatives with their sales, but rather competed with them for commissions; did not pool resources with other telemarketers; and had no interest in the success of the operation as a whole. *See id.* at 576. The present case is entirely unlike *Studley* because here the Telemarketers were not independent of one another. The Nortay scam was truly "a jointly undertaken criminal activity."

Unlike the telemarketers in *Studley*, Nortay telemarketers did not work alone. All Nortay employees worked together to further its fraudulent scheme. Dialers and closers strongly relied on one another to make a sale. The dialers were told that if they had a problem with a victim, they should have Hefferan or Blitz talk the victim over. Giffin wrote the script—"Jakes Pitch"—which he and other dialers used when contacting the victims. All employees attended sales meetings, where Hefferan discussed the sales pitches. Hefferan also provided some of the salespeople with sales advice. Blitz handled the customer complaints, and kept the victims from demanding refunds.

Furthermore, unlike the salespeople in *Studley*, Nortay employees did not work on a pure commission basis. Rather, most of them received a salary. Thus, Nortay's salespeople depended on the success of the Nortay operation as a whole for their financial compensation. Larsen testified that Blitz would pressure the salespeople into talking the victims out of obtaining refunds because if they did not do so, there would not be enough money in Nortay's account to pay their salaries. The district court did not err when it found that the scope of criminal activity the Telemarketers agreed to jointly undertake included all of Nortay's sales activity during the term of their employment.

Thus, we agree with other Courts of Appeals, which have held telemarketers responsible for the losses caused by other telemarketers in their fraudulent company. *See Whatley*, 133 F.3d at 606–07; *United States v. Senn*, 129 F.3d 886, 898 (7th Cir.1997); *Gray*, 105 F.3d at 970; *United States v. Boatner*, 99 F.3d 831, 835–36 (7th Cir.1996). In *Senn*, for example, the Seventh Circuit rejected the argument that it should base its decision on *Studley*. *See* 129 F.3d at 898. It noted that the defendant was a very successful salesman, that other telemarketers used his "rap," and "most importantly, [he] knew from the beginning that the scheme had other participants." *Id.* The court concluded that because of the defendant's "knowledge of the other participants and his critical role in the success of the overall operation, it seems beyond cavil that the sentencing court properly held [him] responsible for the other $77,000 obtained by his telemarketing coconspirators." *Id.* *Boatner*, 99 F.3d at 835–36, also distinguished *Studley* on its facts. The court held the individual defendants liable for the total losses caused by a large insurance fraud scam in which the participants "engaged in a great deal of concerted activity." *Id.* at 836. This case is much more like *Boatner* and *Senn* than it is like *Studley*.

In sum, the district court did not err in holding each of the Telemarketers responsible for the loss caused by the other Nortay telemarketers during the period of each of the Telemarketers' own employment with the enterprise.

### (5) *Knowledge of fraud*

Larsen, Giffin and Hall also claim that the district court erred when it held them responsible for loss caused during the entire period of their employment at Nortay because, they say, they did not have knowledge of fraud during that entire period. *See Lothian*, 976 F.2d at 1263 (defendant can be

held liable for loss caused by the fraudulent activity only if he had knowledge of fraud). Larsen and Giffin contend that because the jury was unable to reach a verdict on some of the counts alleging mail and wire fraud early in their employment at Nortay, it is unclear whether they had knowledge of fraud during that period. We find no merit in their arguments. There was ample evidence that Nortay was a fraud from start to finish and that each of the Telemarketers knew that from start to finish. Any leniency the jury showed them, or uncertainty the jury felt, did not prevent the district court from so finding.[7]

### CONCLUSION

It seems that no sooner is one fraudulent telemarketing scheme suppressed than another one is erumpent. The one we deal with here is, perhaps, at the top of the chain of predation. It did not even sell the victims a few tawdry goods at outrageous prices. The Telemarketers had done that before. Rather it sent the victims a worthless promise to recover money lost to other fraudulent telemarketers. Better yet, the Telemarketers got their victims' names from lists that had been developed when the Telemarketers had worked for other enterprises devoted to cheating those very victims.

The Telemarketers now raise a host of issues of which the major ones are centered on the sentences that their deeds have earned them. Essentially, the Telemarketers do not think that they should be held responsible for the full measure of the loss which they intended to inflict. However, the district court did not err when it faced and dealt with the Telemarketers on their own special Dies Irae. It properly applied the Guidelines when it evaluated the loss to be ascribed to each of the Telemarketers for sentencing purposes.

7. The fact that the jury was unable to reach a verdict on some of the counts did not preclude the sentencing court from considering the conduct underlying those counts. The district court could even have considered conduct underlying acquitted charges, as long as that conduct was proven by a preponderance of the evidence. *See*

DISMISSED as to Hefferan. AFFIRMED as to Blitz, Ste. Marie, Hall, Giffin and Larsen.

*United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 638, 136 L.Ed.2d 554 (1997); *Newland,* 116 F.3d at 404.