### UNITED STATES of America, Plaintiff–Appellee,

v.

### WEST COAST ALUMINUM HEAT TREATING CO.; June Fitch, Defendants–Appellants.

#### No. 00–50402.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 2001

Filed Sept. 13, 2001

Stanley I. Greenberg, Los Angeles, California, for the defendants-appellants.

Lawrence S. Middleton, Assistant United States Attorney; Los Angeles, California, for the plaintiff-appellee.

* Honorable Ronald M. Whyte, United States District Judge for Northern California, sitting

Before: KOZINSKI and THOMAS, Circuit Judges, and WHYTE,* District Judge.

THOMAS, Circuit Judge:

West Coast Aluminum Heat Treating Company ("West Coast") appeals the sentence imposed by the district court following its conviction of six counts of making false statements in violation of 18 U.S.C. § 1001 and one count of conspiracy in violation of 18 U.S.C. § 371. We conclude that the district court did not err in utilizing a loss calculation based on the government's net profit analysis, and we affirm.

I

Someone at West Coast took the aphorism "it's good enough for government work" a bit too seriously. West Coast contracted with the United States Department of Defense and the National Aeronautical and Space Administration to heat treat, age and test aluminum alloy parts for use in military aircraft and weaponry. In the normal course of events, West Coast would expose the parts to high temperatures in a furnace to attain specified strength and corrosion resistance, then quench the parts quickly in liquid to lock the alloy into its desired solid solution condition. West Coast would then age the parts by subjecting them to high temperatures for a specified period of time ranging from four to 24 hours. After aging the parts, West Coast would perform hardness and electrical conductivity tests to ascertain whether the parts were suitable for their intended use.

The government contracts required specific temperatures and aging times. To assure that these contract specifications were met, West Coast was required to

by designation.

complete a "Certificate of Conformance" for the parts it sold to the government.

Contrary to the contract specifications, West Coast began employing a practice of "short heating" and "short aging" the parts, a time-saving measure in which the heating time was reduced with the temperature proportionately increased. These shortcuts were concealed through the submission of false Certificates of Conformance. Additionally, rather than testing all parts for hardness and electrical conductivity, West Coast employees routinely tested only a sample of the lot—typically ten percent. Yet, West Coast certified to the government that it had tested all of the parts.

The government, however, had not ordered its parts "charred rare." Thus, after the false certifications were discovered, West Coast and two officers—President June Fitch and Vice President Eugene Fitch, Jr.—were indicted in the Central District of California in a twelve-count First Superseding Indictment charging nine counts of making false statements in matters within the jurisdiction of the Department of Defense, and causing an act to be done, in violation of 18 U.S.C. §§ 2, 1001, and conspiracy to commit those offenses in violation of § 371. Trial by jury commenced on February 9, 2000 as to West Coast and June Fitch. (Eugene Fitch successfully severed himself and ultimately pleaded guilty.) West Coast and June Fitch were convicted on February 23, 2000, of six counts of making false statements and one count of conspiracy to do so.

Because the probation officer could not ascertain the precise amount of loss to the government in order to apply the specific offense characteristic of the fraud sentencing guideline § 2F1.1(b),[1] the officer recommended in the Pre–Sentence Report ("PSR") for West Coast that the district court estimate the loss based on the net profit to West Coast. To calculate this amount, the PSR noted that West Coast's records "demonstrate that West Coast's government business varied between 70 percent and 40 percent [of its total business], with 40 percent being reported in June 1996 only."

> Giving the benefit to the defendant, the Probation Officer is utilizing the 40 percent figure to determine the amount of money unlawfully taken by West Coast for the fraudulent sales. Between 1993 and 1997, West Coast's total sales were $10,218,040. Forty percent of this figure is $4,167,215. Also, as noted above, a 25 percent reduction is made because some of the government contracts may have only needed to meet a lower standard. Therefore the Probation Officer is utilizing a fraudulent sales figure of $3,125,411.

The Probation Officer then multiplied the sales figure by 45.15 percent—the average of West Coast's profits on sales—to reach a loss total of $1,411,123.

Based on this amount, the PSR recommended the following sentence:

| | | |
|---|---|---|
| Base offense level | 6 | (§ 2F1.1(a)) |
| Loss amount | 11 | (§ 2F1.1(b)(1)(L)) |
| More than minimal planning | 2 | (§ 2F1.1(b)(2)) |
| Risk of serious bodily injury | 2 | (§ 2F1.1(b)(4)) |
| *Total Offense Level* | 21 | |

Pursuant to guideline § 8C2.4(a), the PSR recommended a base fine of $1,411,123, based on the pecuniary loss from the offense. The fine range computation was based on a culpability score of nine, resulting in a minimum multiplier of 1.8 and a maximum multiplier of 3.6. *See*

---

1. "If the loss exceeded $2,000, increase the offense level as follows: ... More than $800,000 [but less than $1,500,000] add 11...." U.S. Sentencing Guideline ("U.S.S.G.") § 2F1.1(b)(1)(L).

§ 8C2.6. Thus, the fine range was computed to be $2,540,021.40 to $5,080,042.80. Because the statutory maximum fine per count is $500,000, see 18 U.S.C. § 3571, the maximum fine for the offense was $3,500,000. The PSR ultimately recommended a fine of $1,632,000.

West Coast objected to the loss calculation in its sentencing papers, arguing that there was no proof that the parts sold to the government were actually defective; thus, the method employed to calculate loss was not a realistic, economic approach. To support this, West Coast submitted a report from Boeing, who also used West Coast parts, indicating that the "short-cut" parts were not defective; and notes by a Department of Defense Criminal Investigative Service agent from a meeting with McDonnell Douglas representatives who reported that "no safety of flight issues have been identified" and who provided reports indicating that although some West Coast parts demonstrated weakness, others passed required tests. West Coast also pointed out that, at trial, government witnesses had testified that the tested parts had passed all applicable tests, and that the government had failed to cite any instances of actual part failure due to the use of the shortened processes.

At sentencing, the district court adopted the findings and recommendations of the PSR. West Coast did not object to the loss calculation, although it did "submit on the presentence report," the addendum to which included its objection from its sentencing position memorandum. The court sentenced West Coast to a term of five years' probation on each count, to run concurrently, and a fine of $234,000 on each count for a total fine of $1,638,000,[2] to be paid in monthly installments of $16,000.

---

**2.** The district court increased the recommended total fine by $6,000 because the PSR failed to list count nine as one of the convic-

## II

■ The primary question in this appeal concerns the proper loss calculation at sentencing when a contractor has fraudulently certified its supplied products as contract-compliant. The district court's choice of method to calculate loss procured by fraud is an interpretation of the Sentencing Guidelines that we review *de novo*. *United States v. Blitz*, 151 F.3d 1002, 1009 (9th Cir.1998). We review the district court's factual findings used in sentencing, including the calculation of loss to the victim, for clear error. *Id.* Contrary to the government's assertion, West Coast preserved its objection to the calculation of the loss in its sentencing memorandum submitted to the probation officer, and thus has preserved this issue for appeal. *See United States v. Barnes*, 993 F.2d 680, 684 (9th Cir.1993).

■ Under the sentencing guideline for fraud convictions, § 2F1.1(a), the offense level for a fraud conviction increases incrementally based on the amount of monetary loss the fraud caused. In describing how to determine "loss," this guideline cross-references the theft guideline (§ 2B1.1), see § 2F1.1 cmt. n. 7 (2000), which in turn explains:

> "Loss" means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim. Loss does not include the interest

tions. It also noted that the fine was below the Guideline range in order to reflect the sales price of the defendant corporation.

that could have been earned had the funds not been stolen. When property is damaged, the loss is the cost of repairs, not to exceed the loss had the property been destroyed.

§ 2B1.1, cmt. n. 2. (2000).

However, § 2F1.1 also notes that, in some fraud cases, the theft guideline's loss definition still may be inappropriate, and that "additional factors are to be considered in determining the loss or intended loss." § 2F1.1 cmt. n. 8(a), (b). The application notes even describe a few situations where the theft-loss paradigm should not be used, and we have already made clear that this list is not exhaustive. *See United States v. Stoddard,* 150 F.3d 1140, 1146 (9th Cir.1998) ("However, the circumstances described in Note 7(a) & (b) are not exclusive and § 2B1.1 is not to be applied mechanically in valuing loss.").

■ Thus, in situations where the application of the traditional theft-loss definition does not accurately reflect the facts of the fraud, we have instructed district courts to "take a *realistic, economic approach* to determine what losses the defendant truly caused or intended to cause." *United States v. Allison,* 86 F.3d 940, 943 (9th Cir.1996) (emphasis added). We have noted that this method "is particularly useful in certain types of fraud cases in which the value of the property obtained, or sought to be obtained, by means of the fraud bears little or no relation to the amount of loss the defendant actually inflicted or intended to inflict." *United States v. Riley,* 143 F.3d 1289, 1291 (9th Cir.1998). As part of the "realistic, economic approach," we have also cautioned that district courts "should not ascribe a larger loss to the defendants than they intended to or actually did inflict." *Blitz,* 151 F.3d at 1010; *see also Riley,* 143 F.3d at 1291. "We have not, however, hesitated to hold defendants responsible for the full

reach of their intent," *Blitz,* 151 F.3d at 1010, and sentencing courts should use the loss the defendant attempted to inflict, if the intended loss can be determined and is greater than the actual loss. *See* U.S.S.G. § 2F1.1 cmt. n. 7; *see also Riley,* 143 F.3d at 1291–92 (intended tax refund, fraudulently obtained, was greater than received refund, and was therefore proper loss amount); *Blitz,* 151 F.3d at 1010–11 (sustaining a fine based on an intended loss greater than the actual loss).

Although easily recited, these principles are not always readily applied in practice. The phrase "realistic, economic" may itself seem oxymoronic to some; others may subscribe to Will Rogers' musing that "an economist's guess is liable to be as good as anyone else's." "Realistic, economic" projections of *intended* loss—which are necessarily hypothetical—present special challenges. This is especially true in the context of false certification cases in which the loss is in the receipt of products that do not meet specifications, even though they may be fit for their intended use.

■ For these reasons, there exists no rigid formula for the sentencing court to follow in attempting to determine the victim's loss in fraud cases when the amount of neither actual nor intended loss is readily apparent. Nor is the district court obligated to search for the perfect theoretical or statistical fit. Within the general principles previously discussed, the district court's obligation is to adopt a reasonable "realistic, economic" projection of loss based on the evidence presented. As noted in the fraud guideline, "the loss need not be determined with precision"; rather, "[t]he court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, cmt. n. 9.

■ In this case, the district court adopted the PSR's suggestion of calculat-

ing loss based on West Coast's profits. Although this methodology may not be the most appropriate one to apply in all circumstances, the guidelines support such an approach. *See id.* ("The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss."); *see also United States v. King,* 257 F.3d 1013, 1024–25 (9th Cir. 2001) (approving of district court's partial reliance on defendant's gain to determine loss). In false certification cases, it is also a reasonable "realistic, economic approach" given that the products delivered may retain value in excess of the profit margin. Here, West Coast committed the fraud in order to gain the amounts due under the contract with lower overhead, and not to cause injury or to provide defective parts. Thus, given the principles discussed above, the district court's calculation of the restitutionary gain to West Coast was not an unreasonable approximation of the *intended* loss given the evidence presented. *Cf. United States v. Castner,* 50 F.3d 1267, 1275–76 (4th Cir. 1995) (holding that, where government received less than what it had bargained for, restitution gained by government contractor was appropriate approximation of loss). And, by reducing the loss calculation to account for the partial benefit gained by the government, the district court remained consistent with the rule that the victim's loss should be offset by the victim's benefit. *See United States v. Harper,* 32 F.3d 1387, 1392 (9th Cir.1994) (rents should be offset by gains to renters).

Of course, good arguments may be made for the application of different methodologies in this context. However, absent any alternative model provided by the defendant—other than a "no harm, no foul" theory resulting in a determination of no loss—the district court did not err in selecting profit as a measure of loss in this case, and its calculation of loss was not clearly erroneous.

## III

■ West Coast also argues that the district court abused its discretion when it adjusted the offense level pursuant to the "risk of serious bodily injury" specific offense characteristic. Because West Coast did not object to this specific offense adjustment below, review is for plain error. *See* Fed.R.Crim.P. 52(b); *United States v. Olano,* 507 U.S. 725, 730–32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). To demonstrate plain error, West Coast must prove that there was "error" that was "plain" and that affected "substantial rights." *Olano,* 507 U.S. at 730–32, 113 S.Ct. 1770. If these conditions are met, the court may exercise its discretion to notice the forfeited error if such error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.*

■ Under Sentencing Guideline § 2F1.1(b)(7)(A), the base offense level must be increased by two levels if the offense involved "the conscious or reckless risk of serious bodily injury." The PSR recommended the upward adjustment because several parts identified in the indictment were either "flight critical" or used in a "flight critical" part. It concluded that West Coast's intentional sale of parts it knew could be defective for use in aircraft justified the upward adjustment, observing that:

It can reasonably be assumed that the defendants knew (or should have known) that the parts they were dealing with were of a nature that not properly heat treating, aging or inspecting them would put at risk the aircraft for which the parts were intended. It is also reasonable to assume that the defendant knew why the parts underwent such strict re-

quirements for inspection; one of those assumptions being that it is a part critical to flight safety. It appears that the defendants were willing to risk the possibility that some of the parts they were passing without full inspection were nonconforming and could cause malfunction in the aircraft or other military vehicle in which they were installed. By not performing proper inspections and by not correctly heat treating and aging the parts the defendants engaged in a "conscious or reckless risk of serious bodily injury" as defined by the guidelines.

The district court adopted the PSR's findings and conclusions.

West Coast argues that, because no injuries have occurred or were intended, and because only "18 out of hundreds of thousands [of parts were allegedly defective] over the life of the fraud, which carried on for almost twenty years," the record did not justify the enhancement.

We disagree. A preponderance of the evidence supported the conclusion that West Coast's relevant conduct consciously caused a risk of serious bodily injury. The district court certainly committed no plain error in applying the adjustment.

Trial testimony revealed that at least some of the employees, including Eugene Fitch, knew the mistreated parts were used in aircraft, and that some of the employees were concerned that the parts were being heated improperly. When West Coast signed the contract, it knew that the parts were to be used in highly complicated, sensitive military aircraft and weaponry in which failure could have catastrophic consequences. At contracting, West Coast knew that the government's specifications were aimed at securing usability, quality, and safety. West Coast also knew that some of the sampled parts that it tested did not meet the minimum performance criteria because it chose to "re-age"

those defective components until they could meet the tests. Despite all of this knowledge, West Coast kept certifying that all the parts it sold had been tested and had been manufactured using contractually compliant processes.

▄▄▄ To put it bluntly, West Coast knew that it was putting the men and women of the United States armed forces in harm's way. The fact that there have been few documented part failures is quite beside the point. A district court need not engage in a sophisticated probability analysis to apply the adjustment. When the consequences of failure are catastrophic, a low failure frequency is of limited relevance. It is the creation of risk, not the infliction of injury, that is required for application of this guideline provision. A district court does not abuse its discretion in applying it when the defendant has acted in conscious or reckless disregard of a known risk of serious bodily injury even if the ultimate probability of occurrence is found to be relatively low.

A similar situation was involved in *United States v. Johansson*, 249 F.3d 848 (9th Cir.2001). Johansson, the president and owner of a privately-owned trucking company, pled guilty under 18 U.S.C. § 1001 for conspiracy to "knowingly and willfully make false statements in matters within the jurisdiction of the Federal Highway Administration ('FHWA') ..., by causing Atlas drivers to violate the [federal] hours-of-driving regulations and to create and maintain false and fraudulent daily logs for inspection by FHWA inspectors in order to conceal the violations." 249 F.3d at 851. We found that Johansson had consciously caused a risk of seriously bodily injury:

> The hours-of-driving limitations are plainly designed to limit driver fatigue and therefore reduce motor carrier accidents. Violations of those regulations

therefore create a "risk" of truck accidents and serious bodily injury. Moreover, by concealing the hours-of-driving violations by creating false log books, Johansson magnified the risk created by the violations by ensuring that they would continue undetected. *Id.* at 859. It was of no consequence that "Atlas had a better than average safety record and there is no evidence that a driver was ever fatigued on any particular occasion"—risk is enough. *Id.* at 860–61.

Knowing that tired drivers can cause accidents is the same as knowing that improperly formed and tested parts used in military aircraft can cause a risk of malfunction and, ultimately, bodily injury or death. The district court did not err in applying the adjustment.

## IV

 The district court did not violate *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), by failing to submit the amount of loss, which determined the fine range, to the jury. Because West Coast did not raise this argument below, we review for plain error. *See United States v. Nordby,* 225 F.3d 1053, 1060 (9th Cir.2000).

West Coast was convicted of one count of conspiracy to make false statements (18 U.S.C. §§ 371, 1001), and six counts of making false statements and causing an act to be done (18 U.S.C. § 2, 1001)— seven felonies, bringing a maximum fine of $3,500,000. *See* 18 U.S.C. § 3571(c)(3) (corporation committed of a felony offense may not be fined more than $500,000). Based on the calculated pecuniary loss, the district court computed the fine range to be $2,540.021.40 to $5,080,042.80. *See* U.S.S.G. § 8C2.4(a). West Coast argues that, because the fine range maximum of $5,080.042.80 exceeded the statutory maximum of $3,500,000, the district court com-mitted reversible *Apprendi* error. However, our precedent forecloses this argument: Despite the high upper end of the range, the sentence actually imposed remained below the statutory maximum. Thus, *Apprendi* does not apply. *See United States v. Hernandez–Guardado,* 228 F.3d 1017, 1027 (9th Cir.2000); *United States v. Egge,* 223 F.3d 1128, 1131 n. 1 (9th Cir.2000).

**AFFIRMED.**